J-S75014-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| KENNETH O'CONNOR | |
| Appellant | No. 3511 EDA 2013 |

Appeal from the PCRA Order November 20, 2013
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0010115-2007

BEFORE:  ALLEN, J., LAZARUS, J., and MUNDY, J.

MEMORANDUM BY MUNDY, J.:                    **FILED DECEMBER 24, 2014**

Appellant, Kenneth O'Connor, appeals from the November 20, 2013 order denying his first petition for relief filed pursuant to the Post Conviction Relief Act (PCRA), 42 Pa.C.S.A. §§ 9541-9546.  After careful review, we affirm.[1]

A previous panel of this Court set forth the relevant factual and procedural background of this case as follows.

> On March 3, 2007, [Appellant] and co-defendant [Patrick] (Horgan) were involved in an altercation with Jonathan Johnson (victim) in the victim's home. After the victim was knocked unconscious, [Appellant] and Horgan took turns stomping on the victim's head; the victim was hospitalized and died of blunt force trauma to the

---

[1] The Commonwealth elected not to file a brief in this matter.

head five days later. The relevant events began twenty-four hours earlier.

On March 2, 2007, [Appellant] and Horgan spent the day consuming drugs and large amounts of alcohol at an apartment complex located at 8225 Roosevelt Boulevard in Philadelphia with some of the residents, "Eileen," Angela Mancini, and "Anna." At some point during the evening, Horgan lost his wallet. While he was leaving the apartment on the second floor, he realized he did not have it. Horgan believed "Anna," a second-floor resident, had stolen it; he became enraged and furiously banged on her door, telling her to return it. Then, [Appellant] found Horgan's wallet at the bottom of the staircase of the public hallway and returned it to him. [Appellant and Horgan] and Angela Mancini left the apartment building, and walked south down Roosevelt Boulevard. Shortly thereafter, in the early morning of March 3, 2007, [Appellant and Horgan] were stopped by Philadelphia Police Officer James Strohm, who was responding to a call about a disturbance at 8223 or 8225 Roosevelt Boulevard.

When Officer Strohm questioned Horgan as to why he was at the apartment building, Horgan replied that he was there "to kick the s[**]t out of the n[**]er for breaking his girlfriend's leg." [Appellant] also said that he was there to "beat the s[**]t out of him too." As he spoke to them, Officer Strohm smelled alcohol on the two men's breath. Officer Strohm discovered that [Appellant and Horgan] had outstanding warrants for their arrest, and took them into custody. When they arrived at the Eighth Police District to be processed for their summary warrants, Horgan was still agitated about his wallet. When Officer James Gillespie asked Horgan to remove all items from his person, he threw his wallet on the table and stated that there was nothing inside it because "the f[**]king sp[*]c b[**]ch took my money and I'm going to go back and get them – going to go back and kill them."

[Appellant and Horgan] were released from police custody between 7:30 and 8:00 a.m. on March 3, 2007. They then proceeded to walk back to 8225 Roosevelt Boulevard to find Horgan's wallet, because he once again claimed it was missing. Although he wanted to go home, [Appellant] decided to stay with Horgan.

[Appellant] and Horgan returned briefly to the first-floor apartment occupied by "Eileen" and Ms. Mancini, then left, bought a case of beer, and drank six cans each at the park. They next bought some pizza and went to [Appellant's] friend's house to drink some more beer. Between 2:00 and 3:00 p.m. [Appellant and Horgan] left the house, picked up vodka, and mixed ice tea, which they bought at the Acme [Market] with the vodka. They drank this on a picnic table with Peter Fedorin, whom they ran into at the Acme. [Appellant and Horgan] separated from Mr. Fedorin and eventually decided to go to the victim's house to "get off the street."

At approximately 5:00 on the evening of March 3, 2007, they arrived at the victim's apartment, located at 8223 Roosevelt Boulevard, right next door to the apartment where the previous evening's events had occurred. [Appellant and Horgan] rang the victim's bell and he walked down the stairs to open the security door. But, before allowing them upstairs to his apartment, the victim asked [Appellant], "Pat is going to be cool, right[?]" [Appellant] responded, "Yeah, everything is going to be all right." The victim then opened the outer security door and the three men walked upstairs to [the victim's] studio apartment.

Once upstairs, they sat around the victim's wooden kitchen table. They drank vodka mixed with iced tea, drank beer, and smoked a bag of crack [Appellant] had bought the previous night. Peter Fedorin arrived approximately thirty minutes later with another bottle of vodka, which the four men shared. Meanwhile Ms. Joniec, the victim's girlfriend, was asleep in the next room of the studio apartment.

- 3 -

Horgan mentioned that he was frustrated over losing his wallet and stated, "I can't believe I lost my f[***]ing money." The victim told him to shut up. Angry at the victim's reaction, Horgan accused him of stealing his wallet and a loud argument ensued. The argument calmed down at first, but then escalated. Because the argument was "getting heated," Mr. Fedorin piped in and asked [Appellant] to stop the altercation.

[Appellant] separated Horgan and the victim by shoving each of them. The victim then assumed a karate stance and told [Appellant and Horgan] to leave his apartment. [Appellant] told the victim to "knock this s[**]t off." The victim then hit [Appellant] with a jab on the side of the ear. [Appellant] wrapped his arms around the victim in a "headlock hug," and started wrestling with him. They continued wrestling and fell onto the wooden kitchen table, causing it to collapse.

During their fall, [Appellant] landed on the victim. [Appellant] allowed the victim to stand up. A fist fight then broke out between the victim and [Appellant and Horgan]. The victim defended himself, fought back with his fists, and fell down a few times. He later grabbed one of the legs from the broken table (the table leg), raised it over his shoulder in a batting stance, and again told [Appellant and Horgan] to leave his apartment. He also shouted at Ms. Joniec, who was now awake, to get his gun from the closet.

Meanwhile, the victim struck [Appellant] in the head with the table leg, causing [Appellant] to fall near Mr. Fedorin – who remained seated on a stool throughout the ensuing fight. Horgan picked up a chair and struck the victim on his side once, causing the victim to loosen his grip on the table leg. [Appellant] grabbed the table leg and started beating the victim's head with it, and the victim collapsed. The victim was unconscious and was bleeding from his head. While the victim was unconscious on the

ground, [Appellant] and Horgan took turns stomping on his head.

Ms. Joniec began screaming and telling [Appellant and Horgan] to stop because the victim was unconscious. Horgan pulled [Appellant] towards the front door. However, [Appellant] yanked his arm away from Horgan's grip and stomped down on the victim's head one last time before finally leaving the apartment.

Once [Appellant and Horgan] left, Ms. Joniec ran to the fire station next door to get help. On her way out of the apartment, Ms. Joniec saw Horgan trying to get back into the apartment – kicking the outer door and ringing all of the doorbells. Horgan was screaming that the victim "hadn't had enough yet." Horgan warned Ms. Joniec "not to say anything or he'd kill [her]." When Ms. Joniec returned from the fire station with a medic, [Appellant and Horgan] were gone.

The victim was taken to the hospital on March 3, 2007 and was pronounced dead on March 8, 2007. Dr. Bennett Preston, an expert in forensic pathology, testified to a reasonable degree of medical certainty that the cause of death was "multiple blunt force injuries to the head." In particular, two skull fractures caused cerebral hemorrhaging, which affected the victim's breathing and eventually led to his death. Dr. Preston also testified that the victim had various lacerations and abrasions on the head and back that were consistent with having been stomped on and having been struck with a table leg.

[Appellant and Horgan] also suffered severe head injuries requiring hospitalization. Horgan was found across Roosevelt Boulevard at Hoffnagle Street and taken to Frankford Torresdale Hospital, where he had his head stapled. From there, Horgan was arrested and taken to the Fifteenth Police District holding cell, where he fainted and was taken to Frankford Hospital['s] Frankford Division for five

- 5 -

> days. [Appellant] managed to make it to his mother's house on the night of March 3, 2007, and she later took him to see Dr. Linn Carleton on March 5, 2007. After surrendering himself to the authorities, [Appellant] was taken to Hahnemann Hospital and later spent five weeks in the Detention Center's Infirmary.

*Commonwealth v. O'Connor*, 4 A.3d 194 (Pa. Super. 2010) (unpublished memorandum at 1-7) (some brackets in original; footnotes and internal citations omitted), *appeal denied*, 9 A.3d 628 (Pa. 2010), *quoting* Trial Court Opinion, 6/26/09, at 1-7.

On September 4, 2007, the Commonwealth filed an information, charging Appellant with one count each of murder in the third degree, criminal conspiracy, and possession of an instrument of a crime.[2] Appellant proceeded to a bench trial, at the conclusion of which, the trial court found Appellant guilty of third-degree murder, but not guilty of the remaining two charges. On October 30, 2008, the trial court imposed a sentence of eight to 20 years' imprisonment, to be followed by 20 years' probation. On November 7, 2008, Appellant filed a timely post-sentence motion, which the trial court denied on March 9, 2009. Appellant filed a timely notice of appeal to this Court. This Court affirmed the judgment of sentence on May 17, 2010. *Id.* at 1. Our Supreme Court denied Appellant's petition for allowance of appeal on October 26, 2010. *Commonwealth v. O'Connor*, 9

---

[2] 18 Pa.C.S.A. §§ 2502(c), 903(a)(1), and 907(a), respectively.

A.3d 628 (Pa. 2010). Appellant did not seek a writ of *certiorari* from the United States Supreme Court.

On October 11, 2011, Appellant filed a timely *pro se* PCRA petition. The PCRA court appointed counsel who filed amended petitions on May 24, 2012 and June 25, 2012. The Commonwealth filed a motion to dismiss on October 3, 2012. The PCRA court conducted an evidentiary hearing on November 20, 2013, at the conclusion of which, the PCRA court denied Appellant's PCRA petition in open court. On December 10, 2013, Appellant filed a timely notice of appeal.[3]

On appeal, Appellant raises the following five issues for our review.

> 1.   Did the PCRA court err as a matter of law in finding that the Commonwealth's central witness was not threatened when it was undisputed that police seized and detained her overnight against her will, without any judicial authority to do so, and only agreed to release her once she testified?
>
> 2.   Did the PCRA court err as a matter of law in finding that undisclosed evidence of official threats against and promises to its central witness to secure her testimony was not material where the [PCRA] court applied a more restrictive standard than the governing rule under ***Brady v. Maryland***[, 373 U.S. 83 (1963)] simply because [Appellant] raised this due process claim at the PCRA stage rather than on direct appeal?

---

[3] Appellant and the PCRA court have complied with Pennsylvania Rule of Appellate Procedure 1925.

3. Did the PCRA court err as a matter of law in failing to address how competent defense counsel could have used this evidence of threats and promises and, instead, relied exclusively on the witness's subjective opinion that the threats and promises did not affect her testimony?

4. Does the record support the findings of the PCRA court where it failed to consider the undisclosed evidence that the police promised the witness that she would be released from custody only after she cooperated against Appellant and also disregarded the undisclosed evidence that police threatened her with perjury if she refused to testify?

5. Did the PCRA court err as a matter of law in failing to consider the objective weakness of the Commonwealth's case against Appellant and the strength of his defense in its overall materiality analysis?

Appellant's Brief at 3.

We begin by noting our well-settled standard of review. "In reviewing the denial of PCRA relief, we examine whether the PCRA court's determination is supported by the record and free of legal error." *Commonwealth v. Fears*, 86 A.3d 795, 803 (Pa. 2014) (internal quotation marks and citation omitted). "The scope of review is limited to the findings of the PCRA court and the evidence of record, viewed in the light most favorable to the prevailing party at the trial level." *Commonwealth v. Spotz*, 84 A.3d 294, 311 (Pa. 2014) (citation omitted). "It is well-settled that a PCRA court's credibility determinations are binding upon an appellate court so long as they are supported by the record." *Commonwealth v.*

*Robinson*, 82 A.3d 998, 1013 (Pa. 2013) (citation omitted). However, this Court reviews the PCRA court's legal conclusions *de novo*. **Commonwealth v. Rigg**, 84 A.3d 1080, 1084 (Pa. Super. 2014) (citation omitted).

Although Appellant phrases his issue on appeal in five separate parts in his statement of questions presented, he combines them all into one issue in the argument section of his brief. We therefore elect to address all of his issues together. Essentially, Appellant avers that the PCRA court erred when it concluded that the Commonwealth did not commit a **Brady** violation when it failed to disclose to the defense that its chief witness, Joniec, was allegedly threatened and held against her will by law enforcement to compel her testimony. Appellant's Brief at 13. Specifically, Appellant complains that the PCRA court erred when it concluded that this undisclosed evidence was not material for **Brady** purposes. **Id.** at 14.

"Under **Brady**, the State violates a defendant's right to due process if it withholds evidence that is favorable to the defense and material to the defendant's guilt or punishment." **Smith v. Cain**, 132 S. Ct. 627, 630 (2012) (citation omitted). "Thus, to establish a **Brady** violation, an appellant must prove three elements: (1) the evidence at issue is favorable to the accused, either because it is exculpatory or because it impeaches; (2) the evidence was suppressed by the prosecution, either willfully or inadvertently; and (3) prejudice ensued." **Commonwealth v. Weiss**, 81 A.3d 767, 783 (Pa. 2013) (citation omitted).

> Pursuant to **Brady** and its progeny, the prosecutor has a duty to learn of all evidence that is favorable to the accused which is known by others acting on the government's behalf in the case, including the police. **Kyles v. Whitley**, 514 U.S. 419, 437 (1995). Pursuant to **Kyles**, "the prosecutor's **Brady** obligation clearly extends to exculpatory evidence in the files of police agencies of the same government bringing the prosecution." **Commonwealth v. Burke**, 781 A.2d 1136, 1142 ([Pa.] 2001). Moreover, there is no **Brady** violation when the defense has equal access to the allegedly withheld evidence. **See Commonwealth v. Spotz**, 896 A.2d 1191, 1248 ([Pa.] 2006) ("It is well established that no **Brady** violation occurs where the parties had equal access to the information or if the defendant knew or could have uncovered such evidence with reasonable diligence[]" (internal citation omitted)).

**Id.** (parallel citations omitted).

In this case, Joniec testified at the PCRA hearing that she told law enforcement on three occasions that she did not wish to testify in court. The first instance was right before Appellant's preliminary hearing, but the detectives told her that "[she had] to go" to testify. N.T., 11/20/13, at 9. The second time was approximately one to two weeks before Appellant's trial. Joniec asked one of the detectives what would happen if she refused to testify at Appellant's trial, and the detective responded that she would be charged with perjury. **Id.** at 14. The third instance was on the second day of Appellant's trial, where Joniec testified that a corrections officer informed her that if she did not get up to go testify, she would be placed in solitary confinement. **Id.** at 16, 29.

Joniec testified that the primary reason she did not wish to testify was because "[she has] social anxiety and it's really hard for [her] to get up in front of people." *Id.* at 20. When Joniec does get up in front of a crowd she tends to "get panic attacks and [] get[s] sick." *Id.* at 20, 24. Joniec testified that the detectives "treated [her] well." *Id.* at 23. Joniec also agreed that they were nice to her. *Id.* Most importantly, Joniec testified that none of the conduct she described amounted to her feeling any pressure to lie at Appellant's trial. *Id.* at 29. To the contrary, Joniec confirmed at the PCRA hearing that her trial testimony, including her in-court identification of Appellant was "truthful." *Id.* at 32.

As noted above, the Supreme Court has held that evidence is material under *Brady* when "the likelihood of a different result is great enough to 'undermine[ ] confidence in the outcome of the trial.'" *Smith*, *supra*, *quoting Kyles*, *supra* at 434. We agree with the PCRA court that the undisclosed evidence was relevant to Appellant's trial, as it bore on Joniec's credibility. Nevertheless, the fact that said statements are relevant does not render them material under *Brady*. As the PCRA court observed, Joniec testified at the PCRA hearing that her testimony at trial was truthful, and the reason she did not want to come to court was solely because of her social anxiety about getting in front of crowds. N.T., 11/20/13, at 20, 24, 32. At best, "the officers influenced Joniec to appear in court, but [] the content of her testimony was unaffected." PCRA Court Opinion, 5/13/14, at 10.

In addition, at trial, even assuming *arguendo* that the jury would flatly reject Joniec's testimony, the Commonwealth presented other direct and circumstantial evidence identifying Appellant as a perpetrator of the crime. The Commonwealth presented the testimony of Peter Fedorin, who identified Appellant as one of the perpetrators of the crime. N.T., 9/9/08, at 29-32. The Commonwealth also presented the testimony of Philadelphia Police Officer James Strohm. Officer Strohm testified that Appellant was outside the victim's residence shortly before the murder and stated that he was there to "beat the s[**]t out of [the victim]." N.T., 9/8/08, at 34. Based on these considerations, we conclude that law enforcement's conduct regarding Joniec's trial testimony does not "undermine [our] confidence" in Appellant's conviction.[4] **Smith**, **supra**. Therefore, Appellant is not entitled to relief under **Brady**.

---

[4] Because we conclude that the undisclosed evidence does not meet the materiality test for **Brady**, we need not address Appellant's issue where he argues the PCRA court erroneously imposed a higher standard under the text of the PCRA, independent of what the Federal Constitution requires. **Compare Commonwealth v. Ly**, 980 A.2d 61, 76 (Pa. 2009) (stating, "[a]s to **Brady** claims advanced under the PCRA, a defendant must demonstrate that the alleged **Brady** violation 'so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place[]'"), **and** 42 Pa.C.S.A. § 9543(a)(2)(i) (same), **with Commonwealth ex. rel. Dadario v. Goldberg**, 773 A.2d 126 (Pa. 2001) (stating, "the language from Section 9543(a)(2)(ii) requiring proof that counsel's ineffectiveness 'so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place' [embodies] the prejudice element of the Sixth Amendment standard for ineffectiveness claims articulated in **Strickland** [**v. Washington**, 466 U.S.
*(Footnote Continued Next Page)*

Based on the foregoing, we conclude the PCRA court properly denied Appellant's PCRA petition. **See Fears**, **supra**. Accordingly, the PCRA court's November 20, 2013 order is affirmed.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>12/24/2014</u>

---

*(Footnote Continued)*

668 (1984)]"), **and** 42 Pa.C.S.A. § 9543(a)(2)(ii) (containing same "undermining" clause as Section 9543(a)(2)(i)).